Good morning. May it please the court. My name is Eitan Castellanich. I'm representing Michael Nygren in this appeal. Michael Nygren has been unable to work since April 2015 as a result of the functional effects of many impairments, including complex regional pain syndrome and bilateral carpal tunnel syndrome. Those are important in particular because the ALJ did not accept the limitations from those impairments. In district court, I did not represent Mr. Nygren in the administrative appeal process. In district court, I felt in my analysis of the case that the ALJ's improper rejection of the opinions of Dr. Kottabegi made it so that his residual functional capacity assessment was incorrect. And as a result, a new hearing should be held. But in digging into the case, I discovered that there were three jobs that even with the residual functional capacity assessment that the ALJ accepted, there were only three jobs that the vocational expert came up with. Two of those jobs were improper because they required a higher reasoning level than Mr. Nygren has under the residual functional capacity assessment, which left only one job, which is lampshade assembler. And the vocational expert, the same vocational expert who said that those other two jobs violated the ALJ's residual functional capacity assessment, the same vocational expert came up with the lampshade assembler. And he was estimating, well, he said he was estimating that there were 22,000 of these jobs. Excuse me. How do the vocational experts estimate it? I mean, could you have crossed, you weren't there I understand it, but could he have been cross examined as to where he got that number from? Well, that's a great question. And I do hearings, so I know what happens at the hearings when you ask a vocational expert about to justify their jobs. They will say typically that, and I think of this, there was testimony about it, that they get their job numbers from Job Browser Pro, or they get their job numbers from one of these services that amalgamates numbers and gives you, you know, you can enter limitations and it'll give you various jobs. The problem is that many of those services that they use, such as Job Browser Pro, if you don't really understand how to use it, it'll give you a number, but the number won't be correct because it won't, it'll, for example, with lampshade assembler, it'll actually take 50 different assembler jobs, amalgamate them all, divide them by 50, and come up with 1 50th of the overall assembler jobs. But out of those 90, 80% of them might be light jobs, and they're very few, and it doesn't really give you figures for each individual. But the problem is that we, this is what we have in our record, and nobody has challenged, I mean, it sounds, you know, off the top of my head, hi, but what do I know? And there is, there's nothing in the record, otherwise. Now, if he, one of his asserted impairments is carpal tunnel, and with his hands. And as you say, that was just counted. If that were back in, presumably, that job would be gone. That's correct. And in fact, there's testimony to that effect, that if he was limited to occasional use of his hands, which was one of the, what's, that's, well, that's certainly, he testified about that. There's lay evidence that supports that as well. And there's medical evidence at the, early on, Dr. Quadir. And Dr. Quadir, the evidence from Dr. Quadir, the ALJ never even evaluated it. And that's some of the strongest evidence that supports limitations in the use of his hands. So yes, you're right, if you add that in, that eliminates the one remaining job. So back to what I was saying before, they only came up with 22,000. It's not clear that 22,000, even if it were a valid number, is a significant number, but it's sort of right on the edge there. And I was actually kind of shocked and surprised when I, after losing in district court, obtained a vocational study that showed that there's about 60, up to 60 of these jobs. I mean, it's nowhere near a significant number. And then it, I guess, begs the question on when a vocational expert gives three jobs, two of them the government has conceded were wrong. And the third one is a mistake. The number is a complete error. It makes no sense. And it's contrary to, well, and back to you, how you're asking, what would, what would a competent vocational expert do? If you sent this case to 100 vocational experts to do a study, 97 of them would come up with 60 to 100 jobs. Mr. Yonage, if I can ask you about that, because I'm just wondering why that, I mean, the ALJ explicitly stated that there were 22,000 lampshade assembler jobs in the national economy. I'm not sure you've been able to point out why that is erroneous, at least in the record. And also, if I'm not mistaken, I don't think Mr. Nygren argued or you in the opening or reply briefs at the district court that the 22,000 lampshade assembler jobs is not significant. So I'm just wondering, isn't that argument waived? I think I argued that it wasn't significant, but the... I can't find it. I was just flipping through the brief. I don't see it. You can tell me where. Okay. I may be stuck on that one. You only have three minutes left and you haven't said anything about the medical evidence particularly. Do you want to talk about that? Right. Well, I think that that was really the theory of the case in district court was that there was opinion evidence from Dr. Duhala about complex regional pain syndrome. And the ALJ completely dismissed that and relied upon the opinions of labored industry doctors who only evaluated him for the purpose of evaluating his workers' compensation injury. They never evaluated him overall. None of their opinions are overall opinions of whether he could work in light of all of his impairments. But they did in particular say that he didn't have this complex pain syndrome, right? They did. They did say that. And Dr. Duhala, who was his treating physician, treating podiatrist, said that he absolutely has it and here's why. And he said it over and over and over again. When the examining doctor said something about he had out of proportion pain, I understood that to mean that that was one of the symptoms of the complex pain syndrome. That's exactly correct. Not that he was faking it. Right. That is one of the symptoms. That is one of the signs of complex pain syndrome. That statement was misunderstood by the ALJ, as I understand it. He read it as them saying that he really couldn't have had this much pain. But that isn't what they were saying. Is that right? I agree with exactly what you're saying. I should hold the rest of my time for rebuttal. Thank you. Good morning. I'm Shada Stuckey appearing on behalf of the Commissioner of the Social Protection. I have a question. How come you're appearing by telephone? And the reason I'm asking you this is because the only people that appear by telephone are U.S. government lawyers. Why are you doing this? Your Honor, I've heard from a number of my colleagues that they've had a lot of trouble connecting through Zoom on our government computers. It really doesn't work very well. And we would rather have the problems, which are very rare, than look at a telephone. A receiver instead of a person. Anyway, go ahead. Yeah, I will report that back. We asked the court to affirm the judgment of the district court and deny Mr. Nygren's request to remand the case for further proceedings. The ALJ based her assessment of Mr. Nygren's abilities on substantial evidence in the record. This evidence included reports from six examining doctors and four state agency medical consultants whose opinions supported the ALJ's decision. The ALJ also pointed to evidence that Mr. Nygren behaved inconsistently at examinations. For instance, Mr. Nygren's limp changed sides upon leaving an appointment. Well, he picked out about three things that were said along the way. Those people weren't available for cross-examination or discussion. I don't know what it means that he, I mean, Dr. Dujela said that he had this problem on both sides and in fact that the bone scan of the right suggested CRPS. I mean, that could perfectly well explain why he was limping on one side and then on the other side. There were a lot of different pieces of evidence that I think the ALJ was looking at as a whole. During another appointment, a doctor questioned Mr. Nygren's claim that he wasn't able to use his ankle at all because there was no significant atrophy of the calf muscle. The ALJ also noted that Mr. Nygren admitted to changing medical providers when they did not agree with his viewpoint regarding his limitations. Further, Mr. Nygren. It's not unusual for people to change medical doctors if they don't think they're being heard. I've done it myself several times. Anyway, again, the ALJ said nothing about Dr. Quadrier. He said basically nothing about Dr. Adebaigi other than that he prescribed the walker, but Dr. Adebaigi also diagnosed CRPS. He also had a lot of, he had a bunch of separate medical findings that were completely ignored as well. So there were at least two major treating doctors whose findings were not taken into account at all. And Dr. Wilkinson's wasn't much either. Is that right? No, I think that Dr. Wilkinson, the ALJ did address Dr. Wilkinson's opinion and discounted it for specific and legitimate reasons. Let me ask you about, can I ask you about that? Basically ignore Dr. Adebaigi. And Dr. Adebaigi in particular agreed on the CRPS several times. I mean, if I could address those one at a time with respect to Dr. Quadrier. Dr. Quadrier, his opinion was issued on in May, 2015, right after Mr. Nygren's workplace injury. Right. And he only had a four month period, but it is evidence that he had this problem at that time and what problem he had. Then after that it continued. So yes, his opinion would be disabled for might not be pertinent, but the fact that he had these issues at that time is pertinent. Right. But I think one of the most important factors that I think may have been lost along the way is that even Dr. Duhala, if you look at Dr. Duhala's specific limitations towards the middle and the end of the period at issue here in September 2016, Dr. Duhala opined that Mr. Nygren could work. It was from a primarily seated sedentary position. Then in September, 2017, Dr. Duhala, although he wrote that Mr. Nygren was not able to work. If you again, look at his more specific limitations, he said, I think in September, 2017, that he said that Mr. Nygren was limited to standing and walking between one and three hours and sitting throughout the day. If you look at the ALJ specific residual functional capacity finding, he said he found the Mr. Nygren could stand and walk up to two hours and sit about six hours in a work day. And this is what the ALJ was saying that she was focused on Dr. Duhala's on Mr. Nygren's specific limitations. Excuse me. Yes, but with regard to the level of pain, I mean, that's really the issue is whether his pain reports were out of keeping with his objective medical evidence. And on that issue, Dr. Duhala said that absolutely not because he diagnosed. I mean, an ALJ can only, you know, make specific findings with respect to functional capabilities in the residual functional capacity. And so an ALJ is looking for a doctor's specific functional assessment. And that's what the ALJ did here. The ALJ said is a complex regional pain syndrome is an objective standard, but it's about pain. Specifically about pain. Right. It's about pain, but an ALJ can't just, I mean, an ALJ needs to actually incorporate specific limitations. And the ALJ here did look to Dr. Duhala, who was the treating doctor and saw that he was saying that Mr. Nygren was limited to standing and walking between one and three hours and sitting throughout the day. And then the ALJ incorporated those specific limitations into the RFC. I don't know what more, I mean, it seems like the only thing else is that he could have just said, oh, we have CRPS therefore disabled, but that's just not the way that these regulations work. It's all in terms of specific functional limitation. And that is really what the ALJ was focused on here. And that's proper under the regulation. Ms. Stuckey, can I ask you a question? Can I ask a question? There are times of pain while we're sitting that's not relevant. I mean, you can either stand, sit, or lie, right? So the fact that you can sit doesn't tell you what kind of condition you're in when you're sitting. But the fact that Dr. Duhala said he could sit for six hours a day. Oh, right. And I'd also like to go, well, that was in a functional assessment for a work release form. I mean, I think that opinion was saying he can sit for six hours a day while working. Counsel, Judge McGee has been trying to ask you a question, if you could just hold up just one minute, I'd really like to hear it. I'm sorry, if I can ask a question, Ms. Stuckey, I wanted to ask you about the ALJ's review of Dr. Wilkinson's opinion. Apparently, you think that the ALJ's review of that opinion was sufficient and supported, but I just had, I had a question because I think your brief highlights that the ALJ may reject a doctor's opinion if it is based almost entirely on the claim itself reporting. And just in my review, that seems to be at odds with our decision in Buck versus Berryhill. While a doctor may not report or may not rely on a self-report regarding physical evidence, I think Buck versus Berryhill does state that an ALJ can't discount a mental health evaluation just because it's based on a self-report and because that's the nature of psychiatry. And I just wanted to hear your response to that and to Buck, why should we follow Buck here? Mm-hmm. I think a major factor in Buck, the court actually emphasized in case, in that case, that the examining psychologist's opinion was contradicted only by the opinion of the non-examining doctor, which was not by itself substantial evidence. Here, by contrast, Dr. Wilkinson's opinion was contradicted by Dr. Rogers' opinion. He was an examining doctor and his opinion, therefore, does by itself constitute substantial evidence. And that's under the Vitonipedian case. But yeah, I understand. And you make that distinction or you compare it to Dr. Rogers, but the ALJ didn't. The ALJ didn't. And I think when rejecting a decision like Dr. Wilkinson, the ALJ is supposed to give a specific sort of analysis of that. And I know the ALJ talks about Dr. Rogers in a paragraph either preceding or just a little bit ahead of Dr. Wilkinson, but he doesn't do the analysis, which I think they're supposed to do. Instead, I'm looking at Dr. Rogers because of why that contradicted Dr. Wilkinson. But you tell me if I'm correct or not in what the ALJ is supposed to do at that point, because I think this what you just said goes into the plaintiff's claim that this is sort of post hoc rationalization. Well, I think it's pretty apparent from the ALJ's decision that she was highly aware of Dr. Rogers' opinion. And I think she makes a more general reference, I'm not looking at it now, to just other evidence in the record. And Dr. Rogers' opinion clearly comes within that category. I think post hoc would be more, if an attorney on appeal is searching through the record to find anything that supports it, regardless of whether the ALJ was aware of it or not. I think from the ALJ's written decision here, we know that she was very aware of Dr. Rogers' opinion and that that was an important part of her analysis. I don't know the date off the top of my head. Dr. Wilkinson was in 2017, was the most recent, I guess from us, to have analyzed him and said that in the last three years, his mental situation that the petitioner here, Mr. Nygren's situation had gotten worse and had increased. So I just was not sure. And I wanted to give you an that discounting of Dr. Wilkinson is sufficient and consistent with our law in terms of how that's supposed to be done, especially in light of Buck. Yeah. Well, I wanted to point out one more thing too about the residual functional capacity. I mean, it does limit Mr. Nygren to performing simple routine tasks with no interaction with the ALJ. I mean, the ALJ here is saying that Mr. Nygren has no mental limitations. In fact, these are quite limiting. And in fact, as you know, it ruled out two of the three jobs the ALJ found, but it leaves that lampshade assembler position that provides a basis for affirming the ALJ's decision. Counsel, before you go off on that, I'd like to revisit Judge McGeeh's question. I don't want to perseverate about Dr. Wilkinson, but I read this differently and I want to give you both a chance to respond as opposing counsel as well. What I see here at ER33 is that the ALJ gave some weight to Dr. Wilkinson. That opinion was generally consistent with a longitudinal record. And then for me, the important question that I'm trying to decipher is the next one. It says the claimant's presentation to Dr. Wilkinson was not consistent with his presentation throughout the record. So what I'm, that can be read to mean that the, not that he's, Wilkinson's being discounted because he relied on the claimant, but the problem is that the claimant was inconsistent with the claimant. In other words, that he presented differently to Dr. Wilkinson than he had to other care providers. Do you read this differently? It sounds like you're focusing on Dr. Rogers, but it just seems internally this says something different that may not implicate our decision in Buck. That he presented different to Dr. Wilkinson. It says the claimant's presentation to Dr. Wilkinson was not consistent with his presentation throughout the record. And that could mean that he was, that Dr. Wilkinson was seeing different symptoms than what Dr. Rogers was seeing. No, my point is, my point is that Buck, Judge McGee is trying to call your attention, both lawyers' attention to the fact that we have a case law, Judge McGee is exactly right, that says when we're talking about a psychiatrist or psychologist who's a mental health care provider, then those opinions are not to be discounted because they rely on self-report because that is the nature of psychology or psychiatry, right? And so that's why this is important. Wilkinson's opinion was given only some weight. It was discounted. I think we all agree upon that. And so what I'm getting at is that this, the ALJ said the claimant's Dr. Wilkinson was not consistent with his presentation throughout the record. So what I'm, what I'm positing, and if you don't have response, you don't have response, but what I'm positing is it seems to me that the problem is that the plaintiff was inconsistent with himself, right? He presented differently to these different care providers and that that's the reason the ALJ was discounting Wilkinson's opinion. That's how I read it. If you don't have a response, so be it, but I want to at least hear from opposing counsel on that point. I see what you're saying now. And I do, I mean, I do think that the ALJ was very focused on looking at the record as a whole, seeing these sort of outlier opinions and discounting them because they went against the, the overall, the rest of the evidence in the record. So yes, I agree with that. Thank you very much. Your time is well expired. And thank you for your time. Mr. Yanch. I'd like to, I have a question about the mental health issue. A patient I just sent into record during the hearing, your client was asked whether he, let's see, whether he, how he was doing with regards to his mental health issues. And he said with the therapy and the, I'm not sure it's page 96, but anyway, he said with the therapy and the medication, he was doing pretty well. So why isn't that the end of the medical, the mental health issue? He wasn't getting therapy and medication, but then he did. And he was doing his mental functioning for the previous, let's say three years or whatever time period we're talking about there before the mental health medication was working better for him and doing pretty well now doing pretty well. It doesn't mean you're able to function. It just means it's working. I'm doing less bad than I was doing. I feel they're controlled pretty well with Dr. Wilkinson to evaluate him that day, would he have come to a different conclusion, but there's no reason in this record for the ALJ to, there's no valid reason stated by the ALJ for rejecting Dr. Wilkinson's opinion about how, how NIGRM was doing at that time. There's also, we have to were improving somewhat. His complex regional pain syndrome was, was becoming more. I know. I was just trying to tie this into the Dr. Wilkinson issue. Right. And with regard to what, isn't there a reason to discount Wilkinson based upon, I mean, judge, judge McGee has asked a good question about our opinion in Buck and how the sentence should be read. Could we get your take on it, please? Yes. First addressing judge McGee's comment. I wanted to be clear that with Buck, it's, it's not that a psychologist can rely on a person's self reports. They can rely in part on their self reports, which is what happened here. But there are, there's a substantial amount of, of objective clinical findings. If there weren't any of those, then it's a different case. I think you might be misunderstanding judge McGee's point. I think she's pointing out that in Buck, we've said that you can't discount an opinion solely because it relies on self reports. If it's a, if it's a mental health opinion, I'm summarizing, but I think that's her point. And I think that was her point, but I think that it's actually more to the effect that if they're relying in, in they can't, they can disregard it if they're relying solely on self reports. A psychologist actually observes the person, ask them questions, does testing. If they rely primarily on the self reports, I think that even with Buck, they can reject it, but here they did not do that. And so I think that's the point of Buck is that they're always going to rely to some extent on, on the self report. That's part of it. Let me just do it this way. If I could forgive me for interrupting, sir. We know what Buck says and what it means, perhaps if you could just tell us how you apply it to this case, that would be helpful. Because now you've really confused me. Do you think Dr. Wilkinson relied on, impermissibly relied on, on the self report without looking at the longitudinal record or what is it you're telling us, please? Well, what I'm telling you is that he relied primarily on his test results, his clinical objective observations. He wasn't just relying on, on, on, on Nygren saying, I am depressed or something like that. He was relying on looking at the guy and then he reported it all that he, he has a depressive ashen countenance, that kind of thing. These are the observations that are considered objective evidence. That's what he was relying on. And that's why under Buck, it was improper for the ALJ to say he relied primarily on his subjective self reports. He didn't do that. He was relying primarily on his objective observations. Turning back to your question, Judge Christin, with regard to his presentation throughout the record, the ALJ doesn't actually point to any actual examples of presentation that actually are significantly different. I mean, a person with depression is going to have, present differently on different days and different times of the day and different months and different years. But there's no significant difference between his presentation and certainly none cited by the ALJ that actually shows any significant difference. With regard to your question earlier about Dr. Rogers, Dr. Rogers did evaluate Nygren in January 2016. So more than a year and a half had elapsed before he was evaluated by Dr. Wilkinson. Okay. Thank you very much. I will stop. Thank you very much. Thanks both of you for your arguments. The case of Nygren versus Saul is submitted and we will go to United States of America versus Reed.
judges: Berzon, Murguia, Christen